Good morning. My name is Charles Kagey. I represent the plaintiffs and appellants collectively referred to as Liberty. I'd like, if possible, to reserve three minutes of my time for rebuttal. Mr. Kagey, could you work into your remarks, identifying for me where in the complaint you are alleging that the competitors that PG&E spoke to are ignorant of the alternative fuels market, and where you allege that you could not have neutralized the alleged disparaging comments by PG&E representatives? I will try to do that, Your Honor. I believe I referred to that in my brief, and I'll probably have to refer to the brief to find the specifics I have. Liberty sued PG&E under Sherman Act Section 2 for monopolizing the alternative vehicle fuels market. Liberty did not sue PG&E for individual acts such as disparagement or false grant applications or below-cost pricing or refusal to supply gas. It sued for monopolization through a course of dealing that included all of these acts. And the question the trial court should have addressed was whether PG&E's acts, taken as a whole, improperly excluded Liberty from the alternative fuels market. But on the Rule 12b-6 motion, the trial court looked at the factual allegations one at a time and it said that none of these, standing alone, could be exclusionary except for the failure to supply gas. And that was an error. The question before the court was whether the acts taken as a whole could be exclusionary. Now, clearly, since one of PG&E's acts, the failure to supply gas, was exclusionary, then the totality of the acts could also be exclusionary. And all of them should have gone on to discovery and to some sort of factual resolution. And that seems to be the clear implication of the California CNG v. SoCal Gas. I say failure to supply gas, but as I understand it, one of the concerns of the trial court was that there was a failure of proof to establish a prima facie case of refusal to deal. So what evidence do you have that your client actually asked for the delivery of gas, which you say PG&E refused? Well, there's a considerable amount of evidence of that, and I think it's quoted to some extent in our briefs. But the real issue before the trial court was not whether they asked, but whether they asked formally in the form of an application. Well, but that's how you ask. Are you familiar with our recent decision in the Snake River Electrical Cooperative? Yes, I am. I did read that. It came out a day or two ago. We had the same problem in that case where we found a failure of proof, although it was after a trial. So we had a more complete factual record. But there was a complete failure on the part of the cooperative to actually make a formal request to Pacific Power to wheel power to the cooperative. Well, yes, in that case, that was what the fight was over. And in that case, it went to trial. And it was dispositive of the plaintiff lost. And the jury lost. And the jury found that the plaintiff lost. But that's the point. If Judge Alsup finds that there simply is no evidence here, and you haven't alleged any, that an actual formal request was made, why not save the parties the time and the expense of the litigation? Isn't that why we have these rules for summary dispositions? Right. We have these rules for summary disposition when there is no genuine issue of material fact. Right. But here the evidence showed that again and again, every time that Liberty identified a place that it thought it could cite its machine, it went to PG&E and it said, tell us if we can get our 50 pounds of gas here. And PG&E came back and said, no, you cannot. For example, on the DeSoto site, I believe this is quoted in our brief, we have a declaration from one of the plaintiffs or an agent of the plaintiffs. Quote, we were told by PG&E that we couldn't get the gas pressure. That pretty much killed the deal. And for San Jose. Is the problem here a technical problem? Because it seems to me that this case is almost a more extreme case than Snake River. In Snake River there was never any question about the fact that the intertie lines existed throughout the region that the plaintiff was requesting the wheeling of the power. Here, isn't there an issue with regard to whether PG&E had the existing infrastructure in order to supply 50 pounds or more at the locations that Mr. Tate wanted it? No, I don't think that, at least at this stage, that's not the case. PG&E has not come forward and said we cannot supply the gas in the places it was asked for. I thought I read something in the briefing about the fact that in the San Jose area that only 20 pounds was available. What you saw in the briefing was a recitation of what's called PG&E's policy. This is not a question of whether the pipelines are there or whether the gas can be provided, but they said they had a policy. And this so-called policy was to supply no more than five pounds per square inch, not because it wasn't available, but because they wanted to allow for some future expansion and so forth. The interesting thing about this policy, however, was that PG&E violated this policy or rewrote this policy for itself. PG&E wanted to site CNG plants, which are the competitors to Liberty's LNG plants. And whenever PG&E wanted to do that, they broke this policy and said, well, we can accommodate the 20 pound per square inch CNG plants. Doesn't that require actual construction? In other words, you have to, in some cases, lay long trenches and put different connectors and that sort of thing in order to tap into a distribution line at a higher pressure. Isn't that why it's important that Mr. Tate make formal application, deposit the money, get the engineering studies done? Isn't that what the whole structure is designed for? Well, that is not what the evidence shows. The evidence, to back up a little bit, yes, you're correct that getting high-pressure gas requires special facilities. Somebody has to dig a trench and make the connection and so forth. And that is why the application procedure is necessary. But it's not sufficient, as the evidence shows that PG&E's practice was, first of all, to help the client, help the customer identify the place where they could get the elevated gas. Only when it was identified would it make any sense at all to put in the application. There isn't any evidence here that people would be told you can get five pounds and so they put in a 50 pound application and suddenly they get the 50 pounds. It's a situation like in a discrimination case. Somebody comes into the company and they say, we don't hire people of your race. And then they bring a discrimination case and say, well, you know, you didn't file an application. Well, I was told that I wasn't going to get a job. Liberty was told they weren't going to get the gas. And so, yeah, it would have been nice to file an application, but the application would have only gotten them 20 pounds. Well, they got 50 pounds in Santa Cruz. They got 50 pounds in Santa Cruz back before they went into commercial production. It's when they went into commercial production they started having their problem. And they did this from multiple sites in San Jose. And they had it for also the DeSoto Cab in San Francisco. And to go back to the policy, just for a minute, there is an explanation for the policy that's given in PG&E's brief. And they say the reason we bent the rules for a CNG plant was that CNG plants are special because they have a limited load factor. They don't need to operate continuously. They can be turned on at night and turned off during the day. And that makes sense as a reason to bend the rule. But LNG plants are doing the same thing. LNG plants are just drawing gas periodically to make fuel. And they do it when it's necessary. They can schedule themselves around the situation as needs be. And if you look exactly in the Leo Declaration, paragraph 18, that's at ER-179, page 6, you'll see that all these reasons that they give that they were bending the rules for themselves, they could just as easily have bent the rules for Liberty. But they didn't do it. And so, you know, whether you look at it as a question of the situation, whether the application is necessary, or you look at it as a question of whether there is a policy, there's still a tribal issue of fact here, whether PG&E refused to give them the gas. It's, as this Court said in Ostruff, you cannot decide as a matter of fact that can't be decided by a jury that an application is absolutely necessary in every case. And we presented considerable evidence to the effect that in this case there was no point in putting an application. Did you process a PUC-approved process, or is this something that the company can unilaterally impose on any prospective test? As I understand it, it has nothing to do with the PUC. It's unilaterally imposed. There's been no suggestion that there was some sort of PUC relief available here. And that, I think, really covers the issue in terms of the access to gas. Unlike in Snake River, where the issue did go to the jury, and the jury made a decision, that's all we're asking for here. Here we have evidence being put up front that Liberty did all it could to get the gas, and there was a further step to take, but the further step wouldn't, on this record, have done them any good at all. Well, they didn't put any money down, and they didn't get the engineering surveys done, right? You don't dispute that. Well, no, I don't dispute that. And that would have allowed them to know how they can run a trench to a distribution or a transmission line. And how far it needed to go. And how far it needed to go, and everything else. But according to what PG&E told them, you can do that, but all you're going to get out of that is 20 pounds. And that wasn't worth it to them. Twenty pounds wasn't going to do them any good. And it wasn't going to do them any good because before they went into the whole thing, PG&E told them, you will get 50 pounds, so design your machine that way. And that's how they got locked into it. If PG&E had said, you could get 50 pounds, and then they didn't put in an application, would that be a different situation? Well, that would be a different situation. So then they would be required to put in an application? Well, yeah, if there's a refusal to deal claim, there has to be some point at which the plaintiff is stopped. In our case, the plaintiff was stopped before the application stage. If PG&E says, go ahead, you can have the gas, at that point there's no claim. What would you have to do to file the application? Would it be all that difficult? Well, there's a certain amount of expense involved, but it certainly was within Liberty's capabilities. And they did it whenever they were told 50 pounds was available. But I just, what is the, I guess I'm a little uncomfortable about antitrust claims on a he said, she said kind of a basis, and that's what this looks a lot like. What is the strongest case in support of your position that the, that what they, in saying that only 20 is available is, would be an antitrust, is a refusal to deal? Well, I don't think we have a. What do we look to? Well, I look to Ostroff, I look to Hanover Shoe, I look to Continental Ore. It said over and over again, the formal demand is not what is important. It's to be able to give evidence that you were refused what you needed. And that's what the evidence here shows. And we start with the evidence that PG&E itself says that this is necessary upfront information. Before the application goes in, the customer needs to know and needs to be told what pressure is available. And if you're told 20 pounds is all you're going to get, I mean, absolutely, which is what much of this evidence says, it just doesn't make any sense to say that. But your position is that 50 pounds was available, and they were just refusing to give it to you. That's correct, yes. And your evidence of that is how their inconsistencies, when they varied from their own policy when they chose to, is that correct? That's one aspect of the evidence.  When they first designed the machine, that's how we got into the situation of having a 50-pound machine instead of a 20-pound machine. It's because on at least one or two occasions down in San Jose, the plaintiffs, after being told that you cannot get anything above 20, it's not available on that site, they went to the mapping department anonymously and found that transmission lines were available that did have the gas. So they did have evidence. And, you know, again, we're on summary judgment. So PG&E may say otherwise, but that's not really relevant at this point. I did want to address Judge Tolman's question for the evidence about the disparaging statements, as I understood it. And I wonder if I could just ask for a second, because I think I've got specific citations here, and I'd like to pull them out. Yeah. Okay. And, Your Honor, specifically, the point was? I wanted to know where it alleges that the competitors that PG&E spoke to were ignorant of the alternative fuels market and where it is alleged that Liberty Fuels was not able to neutralize the alleged disparaging statements. Yeah. And, Your Honor, the ‑‑ I give citations and quotations for that in the reply brief at pages 9 through 11. And I could read the specific citations here now. That's in the second amended complaint. You're referring to the second amended complaint? Well, yeah. And that is quoting and citing to the second amended complaint. All those passages there. All right. Do you want to save some time? Yes, I would like to, please. Good morning, Your Honors. My name is Kirk Jenkins, and I represent the Apelli Pacific Gas and Electric Company. Your Honors, only last month, a unanimous Supreme Court in the Verizon Communications versus the State of Trinco, excuse me, law offices of Trinco case, had this to say about applying antitrust law to a highly regulated industry. Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. The Court went on to say that in a situation where an agency is in place, whose job it is to concern itself with the state of competition, to look at prices, to look at maximizing consumer welfare, that antitrust remedies not only have very little role to play, they can, in fact, be counterproductive because they tend to create false positives, punishing conduct which actually has absolutely nothing to do with exclusion. What the Court said in Verizon goes double here. It applies exactly because what we have here is a highly regulated industry and the California PNC paying very close attention to what's going on here. And we've cited the decisions in our brief, and I encourage the Court to look carefully at the language there because those decisions, and there was one in the LEV market just very, very recently, so this continues. Those decisions are shot through with a strong concern for the competitive situation, for not allowing the utilities an undue advantage, for price, for maximizing consumer welfare, and for the reliability of supply to all customers. Mr. Jenkins, I've read those cases, and you can certainly find support for the proposition, but let me ask you whether there is a distinguishing fact here not present in Verizon, and that is that the PUC had apparently approved the use of ratepayer money in order to encourage PG&E to develop alternative fuels, and that made PG&E a competitor of Liberty Fuels, using ratepayer money, giving it some advantage, presumably for financing purposes. And the allegations are, as I understand Mr. Tate's complaint, that your client essentially used that financial advantage approved by the regulators to exclude from competition a competitor that didn't have that financial advantage because it was a private company. Does that distinguish this case at all from Verizon? Well, I don't think it. The facts that you cite, that there was a ratepayer dollar involvement here, that's true enough, but the problem is that when you get down to analyzing the specific alleged anti-competitive acts, the case falls apart, so to speak. There's no there there when you start taking a close look. Now, first of all, I'd like to speak briefly to this Continental Ore California CNG issue, and after that I'll move on to refusal to deal essential facilities and then finish up with the disparagement issue that was talked about a little. Can you talk about disparagement before? After you talk about your first issue, I'd like to talk about the disparagement. Okay. First of all, the Continental Ore issue, the plaintiff has talked about it as dismembering this case one allegation at a time. In fact, the judge below specifically acknowledged this principle. It's in excerpts of Record-201, page 18, and said he was applying that principle. Well, that rule of law is all well and good, but where the proof fails here is the plaintiffs haven't managed to point to a single instance, a single theory, and say this fact right here, this allegation is what the judge didn't keep in mind here and this should have changed the result on this theory. So this is a theory without an application here, and that's why it falls apart. And secondly, I heard my colleague say something that sounded to me like he was saying that it was not permitted to throw out an antitrust claim on a 12b-6 motion. Your Honors, that can't possibly be the law. That's what 12b-6 motions are for. The judge correctly found that most of the claims here, there was not enough substance to put anyone to the expense and time of discovery. They weren't properly pled. Now I'll move on to the disparagement claim. What I wanted to ask if you could address is, given the factually intensive inquiry of Tate's disparagement claim, how can a court decide this issue on a motion to dismiss? I mean, isn't the court resolving factual matters to grant that motion to dismiss? Well, I think what the district court pointed out correctly is that you can't get past a motion to dismiss and get to summary judgment if you haven't made the allegations to begin with. If you make the allegations and then can offer some evidence to support them, then you can get to summary judgment or even to a jury. The problem is the allegations aren't here, so there's nothing to do discovery about. Specifically, what's missing here, first of all, is the district. And before I get to that, specifically, the disparagements here, what's in the complaint is not this amorphous kind of misleading speech to the market as a whole. What they were actually complaining about in the complaint, and it's also in the opening brief here, although they try to move the ball in the reply brief, and I'm referring to excerpts of Record 107, pages 37 to 43, is they're saying that PG&E sat across the table from specific customers on specific days and made specific allegations about them. They said, we supposedly said, well, the technology doesn't work. It's unsafe. They have no money. That's the question I have. In order to make a disparagement claim on antitrust, do you ñ is it necessary that you make generalized pronouncements to the entire market? Is it insufficient to say they said they made false statements to individuals? Is that? I think it would be extraordinarily difficult to make out a valid disparagement claim when the disparagements at issue are made to specific individuals about one competitor. Because I think the thing that we have to keep in mind, particularly in the disparagement area but really throughout this case, is I heard my colleagues say excluded liberty. But that's not what the issue is here. The antitrust laws don't exist to protect competitors. They exist to protect competition. And over and over again, that's where the proof fails in this case. So, yes, a specific disparagement about an individual in a single instance, I think it would be extraordinarily difficult to make out an antitrust claim. Specifically, the shortcomings on this disparagement issue, I think the district judge was clearly right. They talk about that there are allegations in the Second Amendment complaint that PG&E held itself out as an unbiased educator for less knowledgeable fleet owners and it never revealed that it had a vested interest in the particular issue. I mean, it pretty much said, you know, hey, it's sort of like the unbiased witness to the traffic accident. I don't know either of these people, and I say the light was red for this one. I mean, aren't those allegations made? Yes, they are, Your Honor. But what the facts show is that one of the elements, one of the shortcomings here is clearly likely to induce reasonable reliance. What the facts show is these alleged statements induce no reliance by anybody because in no case did any of these customers say, well, PG&E says your equipment isn't safe, and I'm really worried about that, so I don't want to go forward. What the allegations specifically say is in each instance, the customers reacted exactly the way Judge O'Scanlan suspected they would in the American Professional Testing Services case. They came straight to Liberty and said you need not to trust PG&E because they're out there saying some bad things about you. That's proof that there was no damage even to Liberty, let alone to competition. Two other shortcomings quickly before we move on to refusal to deal. Number one, I think Judge Alsup was correct. There is no factual allegation here showing that these statements were made to customers without knowledge of the subject matter. These people were not completely unknowledgeable about this technology. They were about to invest hundreds of thousands of dollars in these machines. These were highly educated people that were taking a very close look at this stuff. But the single problem that's most obvious, it seems to me, is not reasonably susceptible of neutralization. And where this really jumps out is they talk about one of the cab companies, and they say, well, a PG&E representative said, gee, is your technology safe? And they say, even in the briefs, well, that guy knew perfectly well it was safe because he'd seen a demonstration. Well, the question that that raises is if they're admitting that a demonstration of the technology should have been enough for us to know perfectly well it was safe, why couldn't they give the same demonstration to their customer and prove the technology was safe and effective? Well, if there is, is there not? I was wondering about whether truth is a defense. There is a concern for safety reasons as between the two different technologies. Isn't that right? In other words, the liquefied natural gas is much colder, has to be maintained under pressure, and in that respect it's not as safe for consumers who might be exposed to it? I think that's true, Your Honor. But you bring a good point up on the idea of truth as a defense. In fact, what you see when you look at the specific disparagements that were made is all of them or very nearly all of them were clearly opinions. They weren't really susceptible to a label of being true or false. The closest they come in the complaint is when we allegedly said these people have no money, and it seems to me that what the complaint proves is that, in fact, that was true, far from being false. Well, but their answer to that is we had no money because you drove us out of the market and destroyed our business. Your Honor, it depends on the timing of the statement. Without regard to my last irreverent comment, I mean, is it a defense? They're in bankruptcy now, right? I mean, would it be a defense if a PG&E representative knew that they had fallen on hard financial times and was simply offering his opinion that, you know, you better be careful dealing with these people because they may not be around a year from now? Yes, Your Honor, I believe it could not state an antitrust claim. That is not a disparaging comment? I don't believe it is, no, Your Honor. The other issue on reasonably susceptible of neutralization before I move on, on the subject of not having the money, once again, Your Honor, there are any number of ways to prove to a business partner that you have the money to do a deal. That's clearly reasonably susceptible to neutralization. Now on the subject of refusal to deal. In the Verizon Communications case, the court restricted Aspen Skiing to its facts and said that refusal to deal liability in general was at or near the outer border of Section 2 liability. Well, what we have here, if Aspen Skiing was at the border, this is way, way beyond the border, Your Honors. First of all, a few general facts before we get to the specific sites at issue. The court mentioned earlier the policy that we had in the San Jose Division in order to protect the reliability of supply to everyone to limit requests off the distribution lines to 20 PSIG. I want to emphasize that's off the distribution lines. It has nothing to do with the transmission lines. Therefore, the comment that was made in the brief that, well, at Reed Street, a written application would have been futile anyway because you say you had this policy. It would have been rejected. That's not true. The transmission lines were still a possibility. But what has to be kept in mind here is this is really a two-part system. The transmission lines are really for taking the supply in and moving it over long distances. It's the distribution lines that are really intended to get the gas to the customer. So you're saying that you can't just tap into a 1,000 PSIG line with a regulator for 50 PSIG. That's not what transmission lines are for. That's correct, Your Honor. It is very difficult and very expensive, in some cases extraordinarily expensive, to tap into a transmission line. It's technically possible if the application is correctly filled out and we're paid for the engineering work, then we can find out exactly what's it going to cost. Now, the other point before we talk about DeSoto is the significance of this, and it's supported by our declarations that the transmission line is really for moving the gas and the distribution line is for getting it out, is the default value when someone makes an initial casual call to us. Well, what's available here? The default value is going to be the distribution system. It's only when you go further and say, well, I've got to have 50 PSIG here. Is there a transmission line nearby? How far away is it? What might it cost? That's when people start to take a look at the other options. And what Judge Alsup found very significant, if you read his order, was the Mission Street experience that Liberty had. That, I think, is one of the things he found decisive here, and correctly so, because what Mission Street demonstrated is they set up on Mission Street with a demonstration model and they made an initial contact with us, and the initial answer was, well, we can't get 50 PSIG there. They went further. They did what they didn't do at DeSoto and Reed Street. They pressed. They worked with us. We worked out a way to do it. And what Judge Alsup, the conclusion he drew from that, is these people should have known that it's not as easy as just one initial phone call and then go away. That's what he found important here. Well, in the subject of DeSoto, the DeSoto Cab Company, it's undisputed that all that happened here was that initial brief phone call, and then it was dropped. That's not the conduct of someone who's trying to get the gas rather than set up an antitrust claim. I think Judge Alsup hit the nail right on the head here when he said, why should the massive instrumentation of the Sherman Act hang on something as ephemeral as a conversation like this, with no notes, and what your own witness says, he knew there was a high-pressure line in the neighborhood, and he didn't do a thing, zero, to clear it up. Can that really constitute a Sherman Act violation? That's the reporter's transcript, September 19, 2002, at page 33, lines 20 to 25. It is undisputed that Liberty knew that there was a transmission line in the neighborhood. They did nothing. We were not simply sitting back and waiting for them to say the magic words at DeSoto. PG&E, on the other hand, was very proactive here. We assigned Efren Ornelas to work with them on this subject. We sent them the application. The application they knew perfectly well was essential for Mission Street. They did nothing. They're not in a position to say they knew that the application would be futile, because Harold Lee's testimony was that I knew perfectly well we could get the gas. I was never concerned about that. In fact, Lee said, I think we ought to go ahead and do the trench to make the connection to the transmission line. They point to a consultant who said, well, it killed the deal, our inability to get the gas. But Harold Lee, they can't create a tribal issue by contradicting their own evidence. Harold Lee said he is a co-inventor and a partner in the company. Ray Tate and Harold Lee are basically the principals of this company. They can't create a tribal issue for summary judgment by contradicting their own evidence. And also, quickly on that subject, since my time is running out, the evidence on DeSoto Street from Mr. Gillespie is that the deal died for completely different reasons. He said it came as news to him that there was any issue about gas supply. Quickly on the subject of Reed Street, what happens here, taking their evidence as true, since we're on summary judgment, was that there was, again, that initial casual phone call. They got the answer that was dictated by the distribution line, 20 PSIG. They then went in and asked a different question. They didn't say, how much can we get for our machine? They said, what are the lines nearby? Well, gas, when it moves out of a pipeline, every foot it travels, the pressure drops. So to say there's a 40 PSIG line is not to say you can have 40 PSIG at your machine inside the building. But anyway, they were told that there were these two lines that were available, including a high-pressure transmission line. Once again, they did nothing. This is not the conduct of someone who believes that they're being blockaded by a utility. This is much more the conduct of somebody who's trying to set up a lawsuit. They can't say that the application would have been futile, the one they knew was necessary. What was it? Does the record show there's any place where they could have got the 50? The record shows they only – well, the demonstration unit, they did get it at Mission Street. They did get it in Watsonville and Arrington Road. What the record shows is that in the central division of PG&E, it's much easier to get it. And San Francisco is more difficult. San Jose is very expensive. Okay, you've just about used your time. Thank you, Your Honor. Thank you. Thank you. I'd like to just respond briefly to a couple of those points. On the discussion of Trinco, I think the letter we sent to the court covers the legal issues pretty well there. But certainly I would not agree that we have the same sort of regulated industry situation that we had there. There's no suggestion that there was a regulation on providing the gas to our clients. This wasn't a situation where a new price had to be created. Our clients were going to pay the retail price. Well, but the pipelines, the way that this is – the way that they have to build all their network, infrastructure, whatever you want to call it, that's all regulated. Well, there's safety regulations and so forth. But, I mean, PG&E builds it. Where they can go and – Well, right. But in terms of what we're talking about here, we don't have the type of regulation that you saw in Trinco. Here we're trying to pay the retail price like many other industrial customers do to do exactly what PG&E is supposed to do, which is sell natural gas. And that's what's going on here. Mr. Kage, I forgot to ask you when you were up the first time, can you give me any decision from any circuit upholding a predatory pricing theory when the prices are merely advertised and never actually charged? No, I cannot. This would be a case of first impression on that theory. Well, it would be a case of first impression on that theory if we brought just a predatory pricing claim and said that in and of itself proves monopoly. But you say there's all this other stuff we've alleged, so you can never dismiss us because you have to have a trial on everything. No. I certainly don't say that you can never dismiss us. I take exception with that point, too. What we have here is we already know the 12b-6 motion had to be denied because there was an adequate claim of monopolization. The question is whether here, as the Supreme Court said in Aspen's scheme, that once you have a recognized claim for monopolization, do other acts which standing alone may not be enough to create monopolization, can they be used to help bolster the inference? And that's the role played by some of these other allegations. And that's what should have happened here. I'm not saying that 12b-6 can never be denied. 12b-6 wasn't denied here. But in this situation, when we got to summary judgment, the other things shouldn't have been thrown out. They should have been considered at that time, too, and that's what did not happen. So it's not true that we can't point to any allegation the Court didn't keep in mind. When it did the summary judgment, all of the allegations except for the access to gas were missing in action. On the point of the transmission lines, it seemed to be a – we got a pretty strong jury argument from the other side, the fact that if you believe this fact and you vote for this fact and this fact, well, as in Snake River, then the defendant should win. But we aren't yet at the point where we make the jury argument for the trial. And one of the facts that was – But there's one big difference between the facts at Snake River, and that is that the transmission lines, the electrical transmission lines, the grid, existed throughout the area to be served by the Snake River cooperative. And it was just a matter of asking for permission or agreement from Pacific Power to agree to wheel the power across the existing infrastructure. What's different here, it seems to me, is that it isn't simply a matter of tapping into the nearest available gas line. Because if it's a transmission line, that's going to be a whole lot more work and so on than if it's a distribution line. And the distribution line may not be able to give you sufficient pressure. And that's a very different situation. But, you know, we are in a position here of looking at facts that are in dispute. I mean, we heard an argument just a few minutes ago that transmission lines are something special and you can't get in the transmission lines unless you file applications. We don't give up-front information about them. And that just isn't the case. I mean, this isn't something that was really argued down below. But if you look at the record, it's SER, sealed excerpts of record, to page 55. This was Exhibit 18. We see a PG&E document. We put in a bunch of documents showing PG&E giving the up-front information before the applications were filed. And this is one where the PG&E says that the client will restate the information we gave you in our field meeting. There are mains available. One is the 24-inch transmission pressure main. The other one is the distribution main. So, you know, transmission lines are different from distribution lines, but at least on the record we have here in terms of undisputed facts, it's certainly not clear that our clients should not be able to tap into them. The record is completely to the contrary at this point. And maybe if we get to trial we'll get new facts and something will be resolved differently. But we're not at that stage now. Your time has expired. Thank you very much. The case just argued is submitted for decision. Here's the last case for argument. Franchise holding versus Cunnington Restaurant.
judges: Schroeder, Tallman, Callahan